Belynda BOWMAN–COOK, Petitioner,

v.

WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,
Respondent.

No. 09–AA–608.

District of Columbia Court of Appeals.

Submitted Dec. 7, 2010.

Decided March 10, 2011.

Isaac C. Trouth, for petitioner.

Carol B. O'Keeffe, Mark F. Sullivan, Gerard J. Stief, and Fredric H. Schuster for respondent.

Before REID and THOMPSON, Associate Judges, and SCHWELB, Senior Judge.

THOMPSON, Associate Judge:

Petitioner Belynda Bowman–Cook seeks review of a decision by the Office of Administrative Hearings ("OAH") that she was ineligible to receive immediate unemployment compensation benefits because she was terminated from her job with respondent Washington Metropolitan Area Transit Authority ("WMATA") for conduct that constituted "other than gross misconduct." [1] Because the factual findings made by the OAH administrative law judge ("ALJ") were not adequate to support the determination that the conduct for which petitioner was terminated was intentional, and because petitioner was precluded from presenting potentially relevant evidence, we reverse and remand.

## I.

Petitioner was employed for several years as an electrical helper at WMATA. WMATA's personnel policy manual provides that when an employee is absent from the job for medical reasons, she must "provide a current telephone number and address to the supervisor," "be available to receive telephone calls at this telephone number," and "accept mail sent by [WMATA] to this address." [2] During late June 2008, petitioner became ill, called in sick, and never returned to work prior to being terminated. According to the evidence presented by WMATA at an evidentiary hearing before OAH, on July 10, 2008, WMATA mailed a certified letter to petitioner's

---

1. 7 DCMR § 312.5 (2006).

2. We note, tangentially, that section 116(d) of the contract between WMATA and petitioner's union, a provision that WMATA invoked in its letter terminating petitioner, states that an employee on sick leave must report "a telephone number *or* address where the employee can be contacted during the period of illness" (emphasis added).

address (her sister's home) and instructed her to report to her supervisor and to provide medical documentation regarding her absence from work. On August 29, 2008, after the July 10 letter (as well as an earlier certified letter from WMATA advising petitioner of a change in her work schedule) had been returned by the United States Postal Service as unclaimed, WMATA sent another certified letter warning petitioner that further failure to accept correspondence would result in her discharge. When the August 29, 2008 letter was returned as undeliverable, WMATA sent petitioner an email on September 5, 2008, advising her that it would be mailing her another letter (a copy of which, the email stated, was "attached" to the email) and that she should comply with the letter's instructions. On September 8, 2008, petitioner responded to WMATA by email, stating:

> PLEASE DO NOT CALL MY HOUSE OR E–MAIL ME AGAIN! I am in treatment and I am unaware of a return to duty date. I do not need your continued harrassment (sic) or threats concerning my employment. Please, Please leave me alone.

On September 29, 2008, WMATA sent petitioner a letter notifying her that she had been terminated. WMATA's representative at the hearing confirmed that petitioner was terminated for "fail[ing] to accept mail as she is required to do at the address that she had given WMATA as her current address."

After a Department of Employment Services claims examiner denied petitioner's claim for unemployment benefits, the ALJ conducted the evidentiary hearing on February 9, 2009. In his May 13, 2009 decision following that hearing, the ALJ found that WMATA "fired [petitioner] for failing to accept certified mail during a medical absence, which it considered a violation of its workplace rules." The ALJ then went on to consider whether petitioner's conduct constituted "gross misconduct," a term defined by the applicable regulations to mean "an act which deliberately or willfully violates the employer's rules, deliberately or willfully threatens or violates the employer's interests, shows a repeated disregard for the employee's obligation to the employer, or disregards standards of behavior which an employer has a right to expect of its employee." 7 DCMR § 312.3 (2006). The ALJ recognized that "[i]f a violation of the employer's rules is the basis for a disqualification from benefits," to uphold the denial of benefits the ALJ must find that "the existence of the employer's rule was known to the employee," that "the employer's rule is reasonable," and that "the employer's rule is consistently enforced by the employer." 7 DCMR § 312.7. The ALJ found that petitioner had access to and was aware of WMATA's policy about employees on sick leave accepting mail from WMATA, but that WMATA, which bore the burden of proof of misconduct, *see* 7 DCMR § 312.2, had presented no evidence to show that it consistently enforced its rule about employee acceptance of mail during a medical absence.

The ALJ next considered whether WMATA had proven "gross misconduct" by showing that petitioner had "disregard[ed] standards of behavior which an employer has a right to expect of its employee." 7 DCMR § 312.3. The ALJ reasoned as follows:

> Considering the record as a whole, I conclude that Employer has proven that Claimant was discharged for misconduct. Although Claimant's sister testified credibly that Claimant required care and assistance when she was ill, the evidence presented at the hearing does not establish that Claimant was actually

so incapacitated from June 30, 2008, through September 25, 2008, that she was incapable of accepting letters sent by Employer to her then-current address. Employer had a material interest in determining when Claimant would be returning to work, and Employer also had a reasonable expectation that Claimant would make a good faith effort to receive letters mailed to her usual contact address.

The one direct communication from Claimant to Employer during the period in question was Claimant's reply email to Mr. Kellar on September 8, 2008. In that email, Claimant demanded that Employer cease communications with her entirely: "Please, Please leave me alone." Exhibit 206. That email suggests Claimant was not open to receiving communications from Employer during her absence. Considering the attitude expressed in the email and the credible testimony and documentary evidence indicating that mail was sent by Employer to Claimant and not received, I conclude that Claimant breached an obligation to her Employer and thereby violated a material Employer interest. 7 DCMR 312.5.

The ALJ nevertheless found that petitioner's illness, shown through "plausible" testimony from petitioner's sister and daughter to have "interfere[d] in a significant way with [petitioner's] ability to manage daily tasks and interpersonal relations,"

was a mitigating circumstance that precluded a finding that petitioner's misconduct entailed "the level of willfulness or deliberateness necessary for a finding of gross misconduct." Accordingly, the ALJ held that petitioner's conduct constituted "simple misconduct" [3] that disqualified her "from receiving unemployment benefits for the first eight weeks otherwise payable." [4] After the ALJ denied petitioner's motion for reconsideration, this petition for review followed.

## II.

Our standard of review is as stated recently in *Morris v. United States Envtl. Prot. Agency*, 975 A.2d 176 (D.C. 2009):

"This court must affirm an OAH decision when (1) OAH made findings of fact on each materially contested issue of fact, (2) substantial evidence supports each finding, and (3) OAH's conclusions flow rationally from its findings of fact." *Rodriguez v. Filene's Basement, Inc.*, 905 A.2d 177, 180 (D.C.2006). "Factual findings supported by substantial evidence on the record as a whole are binding on the reviewing court, although this court may have reached a different result based on an independent review of the record." *McKinley v. District of Columbia Dep't of Emp't Servs.*, 696 A.2d 1377, 1383 (D.C.1997) (citation omitted). In conducting our review, we are bound by the rule that "[a]n admin-

---

**3.** Simple misconduct, or "other than gross misconduct," "mean[s] an act or omission by an employee which constitutes a breach of the employee's duties or obligations to the employer, a breach of the employment agreement or contract, or which adversely affects a material employer interest. The term 'other than gross misconduct' shall include those acts where the severity, degree, or other mitigating circumstances do not support a finding of gross misconduct." 7 DCMR § 312.5.

**4.** *See* D.C.Code § 51–110(b)(1)–(2) (2001) (providing that an "individual who has been discharged for gross misconduct ... shall not be eligible for benefits until he has been employed in each of 10 successive weeks ..." and that an "individual who is discharged for misconduct, other than gross misconduct ... shall not be eligible for benefits for the first 8 weeks otherwise payable to the individual....").

istrative order can ... be sustained [only] on the grounds relied on by the agency." *Georgetown Univ. Hospital v. District .of Columbia Dep't of Emp't Servs.*, 916 A.2d 149, 152 (D.C.2007) (citation omitted). "If the agency fails to make a finding on a material, contested issue of fact, this court cannot fill the gap by making its own determination from the record, but must remand the case for findings on that issue." *Brown v. Corrections Corp. of America*, 942 A.2d 1122, 1125 (D.C.2008) (citing *Colton v. District of Columbia Dep't of Emp't Servs.*, 484 A.2d 550, 552 (D.C.1984)). *Id.* at 180–81. In reviewing petitions arising under the unemployment compensation laws, we also bear in mind that the program is a "remedial humanitarian [program] of vast import," and that the statute and regulations implementing it must be "liberally and broadly construed," *Cruz v. District of Columbia Dep't of Emp't Servs.*, 633 A.2d 66, 69 (D.C.1993) (citation omitted), so as to serve its purpose of protecting employees "against economic dependency caused by temporary unemployment and to reduce the need for other welfare programs." *Washington Times v. District of Columbia Dep't of Emp't Servs.*, 724 A.2d 1212, 1216–17 (D.C.1999).[5]

## III.

■ Petitioner contends that the ALJ (1) erred in concluding that she was terminated for misconduct because the evidence was not sufficient to permit the ALJ to find that she intentionally acted in a manner adverse to the employer and (2) erred

in determining that her actions constituted misconduct without allowing her to present evidence about communications, regarding her illness, that she and her representatives had with WMATA during the period in question. We agree with petitioner as to the latter point. As to the first point, we conclude that even if (as WMATA argues) the evidence was sufficient to permit the ALJ to conclude that petitioner intentionally failed to accept mail from her employer, the ALJ did not make factual findings necessary to support that conclusion.

In her testimony at the hearing, petitioner denied refusing to accept certified mail from WMATA. In addition, testifying on petitioner's behalf, petitioner's sister stated that petitioner did not receive any certified mail that she (the sister) signed for, and that "we got [only] one" certified mail notice. Petitioner's sister explained that, about three weeks after receiving that one notice, she and petitioner went to the post office to claim the certified mail, but learned that the post office had returned the mail to WMATA. Petitioner's sister also testified that petitioner—who asserts that she was suffering from major depression throughout the period of her absence from work—was not able to handle her own business during this period, that she (the sister) was responsible to "do it all" and take care of petitioner, that petitioner's bills went "slacking" during her illness, that petitioner's medications "made her sleep really hard," and that she (the sister) "had to wake [petitioner] up to even attempt to feed her."

5. It bears repeating that "[w]hether an employee was rightly discharged" for misconduct is "an issue 'distinct' from whether the employer has 'a reason to discharge [the employee].'" *Doyle v. NAI Pers., Inc.*, 991 A.2d 1181, 1183 (D.C.2010); *see also Morris v. United States Envtl. Prot. Agency*, 975 A.2d 176, 182 (D.C.2009) ("In determining whether an employee has engaged in disqualifying misconduct, the agency cannot simply inquire whether the employer was justified in his decision to discharge the employee: Not every act for which an employee may be dismissed from work will provide a basis for disqualification from unemployment compensation benefits because of misconduct.") (citations and internal quotation marks and alterations omitted).

The ALJ found that petitioner "was ill and was relying on her sister for assistance with personal tasks and medical care," that petitioner was taking medications that made her "lethargic," and that petitioner "was aware of at least one of the certified mail notices" since she "accompanied her sister to the post office several weeks after it arrived." The ALJ also found that petitioner's "sister received several notices from the post office about certified letters for [petitioner], but she was too busy caring for [petitioner] to try to retrieve them, and she does not generally retrieve [petitioner's] mail anyway." The ALJ made no finding, however, about whether petitioner (as distinct from her sister[6]) actually received notice that the Postal Service had attempted to deliver the other certified mail letters (and this court "cannot fill the gap by making [our] own determination from the record"[7] about whether petitioner received such notice). Without making a finding as to that critical question, the ALJ had no basis for determining that petitioner "refus[ed] to receive mail" from WMATA, or that she acted intentionally in failing to "make a good faith effort to receive letters mailed to her usual contact address." Accordingly, the ALJ did not have an adequate basis for concluding that petitioner committed misconduct, because "implicit in [the] definition of 'misconduct' is that the employee *intentionally* disregarded the employer's expectations for performance." *Washington Times*, 724 A.2d at 1217–18 (emphasis added) (explaining that "[o]rdinary negligence in disregarding the employer's standards or rules will not suffice as a basis of disqualification for misconduct" (citing

*Keep v. District of Columbia Dep't of Emp't Servs.*, 461 A.2d 461, 463 (D.C. 1983))); *see also Chase v. District of Columbia Dep't of Emp't Servs.*, 804 A.2d 1119, 1124 n. 12 (D.C.2002) (explaining that a finding that the employee's misconduct was intentional "may be required even for a finding of simple misconduct"); *Jadallah v. District of Columbia Dep't of Emp't Servs.*, 476 A.2d 671, 676–77 (D.C.1984) (per curiam) (remanding for a finding as to whether the terminated employee had "intended to engage in wrongdoing").

■ As described above, the ALJ also premised his conclusion that petitioner was discharged for misconduct on the fact that her termination followed her September 8, 2008 email to WMATA, which showed that she was "not open to receiving communications from Employer during her absence." We agree with petitioner that it was error for the ALJ to premise the "misconduct" determination on the demands that petitioner set out in her email ("Please do not call my house or e-mail me again!") without having permitted petitioner to present evidence of other communications that she claims she had with representatives of WMATA during the period when she was absent from work.[8]

Petitioner asserts that she was in "constant contact" with WMATA during this period, and the ALJ even found that petitioner's "daughter attempted to deliver certain documentation to [petitioner's] supervisor on [petitioner's] behalf later in the month [of July 2008]." But, during the hearing, the ALJ stated that he was "not sure any of this [information about petitioner having submitted healthcare provider documentation to WMATA's

---

6. Petitioner's sister testified to having "to deal with a lot of things" to handle petitioner's affairs and to take care of petitioner's daughter, seeming to imply that she was somewhat overwhelmed with the responsibility.

7. *Brown*, 942 A.2d at 1125.

8. OAH was required to "give[ ] full and reasoned consideration to all material facts and issues." *Jones v. Police & Firemen's Ret. & Relief Bd.*, 375 A.2d 1, 5 (D.C.1977).

medical office] is relevant," and thereafter he instructed petitioner that she could ask "[n]o more questions" about any notifications she might have given to the WMATA medical office. The ALJ also repeatedly declined to admit documents not pertaining to the narrow issue of petitioner's "not accepting [three pieces of] certified mail." He cut off both petitioner and WMATA's counsel when they attempted to pose questions about anything other than petitioner's refusal to accept certified mail, he limited witnesses to that subject,[9] and he permitted only brief questioning about petitioner's ability to handle her business during her illness and her ability to retrieve her mail—ruling each time that, to be relevant, the questioning had to focus on petitioner's refusal to accept certified mail.

As a result, petitioner was unable to present documentary evidence such as Exhibit 108, which she had available at the hearing and submitted with her motion for reconsideration. Exhibit 108 includes several "Verification of Treatment" forms, each bearing what purports to be a medical provider's signature under a statement that petitioner "has been ill and unable to work [during specified dates during the summer of 2008]." On some of the forms, there are handwritten notations from petitioner addressed to a "Ms. Hardy" stating, e.g., "Please let me know if I need another Return to Duty Still Out form" and "Please let me know if you need anything else from me." At the hearing, WMATA's representative confirmed that "Ms. Hardy" works in WMATA's medical office, and stated that Ms. Hardy told him that documents pertaining to petitioner's illness had been sent to that office. Had the ALJ not

ruled that documents other than those pertaining to petitioner's receipt of certified mail were irrelevant, petitioner might have offered these documents as evidence that she was open to communicating with, and to receiving communications from, WMATA during her absence, and that she showed regard for WMATA's "material interest in determining when [she] would be returning to work." In addition, had the ALJ not curtailed petitioner's presentation of evidence about her condition during her absence and not excluded evidence unrelated to petitioner's receipt of certified mail, petitioner might have been able to explain that the notation "recurrent 2963" on one of the medical provider forms included in petitioner's Exhibit 108 (apparently) was a reference to the diagnostic code for major depression—evidence that may be relevant to a determination about whether petitioner intentionally failed to accept WMATA's certified mail.[10]

Because the ALJ did not make a finding as to whether petitioner personally had notice of the certified mail that respondent sent during her medical absence from work (such that her failure to accept the mail could be said to be intentional), and because petitioner was precluded from presenting evidence about her communications with respondent and about her medical condition during her absence from work (evidence that also might have been pertinent to the issue of misconduct), we reverse and remand for further proceedings not inconsistent with this opinion.

*So ordered.*

9. For example, the ALJ would not allow petitioner to elicit testimony about the document that petitioner's daughter submitted to petitioner's supervisor.

10. Petitioner asserts, perhaps with justification, that the ALJ's conclusion that she exhibited an unwillingness to cooperate with WMATA "fails to take into account the nature and extent of the petitioner's illness."